## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAMSUNG SDS AMERICA, INC. | Civil Action No.: _____ |
| *Plaintiff,* | |
| v. | **COMPLAINT AND JURY DEMAND** |
| WINMAGIC, INC., | |
| *Defendant.* | |

Plaintiff Samsung SDS America, Inc. ("SDSA"), by and through its attorneys, Fox Rothschild LLP, by way of its Complaint against defendant WinMagic, Inc. ("WinMagic"), hereby alleges as follows:

### PRELIMINARY STATEMENT

1.     This lawsuit arises out of WinMagic's failure to abide by the terms of a License Agreement that was entered into between SDSA and WinMagic, dated April 25, 2016 (the "License Agreement") and other actions and omissions related to the parties' business dealings, as described herein.  A true and accurate copy of the License Agreement is annexed hereto as Exhibit A.

2.     Notwithstanding the express terms of the License Agreement, WinMagic failed to provide SDSA with working versions of the deliverables listed on Exhibit A-1 (the "Deliverables") to the License Agreement, triggering SDSA's express contractual right to demand a full refund from WinMagic after providing WinMagic with a reasonable opportunity to cure various noticed deficiencies.

3.      Despite numerous timely demands by SDSA, WinMagic has failed and refused to refund SDSA the $277,100 that SDSA paid for the non-functioning Deliverables to the License Agreement, in violation of express and implied warranties that arise under the License Agreement, and in violation of SDSA's other rights at law and in equity.

4.      To date, WinMagic has continued to wrongfully withhold the $277,100 paid to it by SDSA, despite the fact that SDSA is unable to make use of the partial provision of Deliverables that WinMagic has made to SDSA.

5.      Accordingly, through this action, SDSA seeks to recover all sums paid by it to WinMagic, plus attorneys' fees, costs, and applicable interest.

## PARTIES

6.      SDSA is a business entity organized pursuant to the laws of the State of California, with its principal place of business located in Ridgefield Park, New Jersey.

7.      WinMagic is a foreign corporation with its principal place of business at 5600A Cancross Court, Mississauga, Ontario, Canada L5R 3E9.

## JURISDICTION AND VENUE

8.      Jurisdiction is appropriate in the United States District Court pursuant to 28 U.S.C. §1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between SDSA, a citizen of the United States, and WinMagic, a citizen of a foreign state.

9.      Venue is appropriate in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. §1391(b)(2) because the District of New Jersey is where a substantial portion of the facts giving rise to the causes of action set forth in this Complaint occurred.

10.     Moreover, pursuant to the License Agreement, SDSA and WinMagic agreed that "[t]he courts and authorities in the State of New Jersey shall have jurisdiction over all controversies that may arise under or in relation to this Agreement."  (*See* Exhibit A, License Agreement at ¶9.7).

## FACTS COMMON TO ALL COUNTS

**A.     SDSA Seeks an Enterprise Level Technology Solution from WinMagic**

11.     SDSA came to learn of the purported capabilities of a specialized enterprise level technology solution distributed by WinMagic that is known as the SecureDoc Enterprise Client TJ ("SecureDoc"), and SDSA began a business relationship with WinMagic to acquire SecureDoc licenses for use in SDSA's and its client's business operations.

12.     The supposed capabilities of WinMagic's SecureDoc solution were purportedly suitable for the specific business needs of SDSA and its client based upon WinMagic's representations to SDSA.

13.     SDSA and WinMagic entered into a non-disclosure agreement on or about November 20, 2015 (the "Non-Disclosure Agreement") to afford WinMagic the necessary information to provide SDSA and SDSA's client with an effective technology system, scaled to SDSA's and its client's needs, and deployed throughout the targeted parts of SDSA's operations and SDSA's client's operations.

14.     The information gathered by WinMagic about SDSA, SDSA's client, and their respective operations under the Non-Disclosure Agreement was intended to ensure that there would be no future operational issues that would inhibit SDSA or its client from utilizing SecureDoc for its intended purpose.

15.     For example, SDSA's representatives specifically and unequivocally advised WinMagic that the SecureDoc solution *must* be compatible with the encryption configuration that SDSA and its client were required to utilize on the computers used in their business operations based upon the requirements of their respective parent companies.

16.     Pursuant to the Non-Disclosure Agreement, SDSA and WinMagic agreed that each party would not disclose certain confidential information that they would learn about the other's business, including, but not limited to, proprietary information relevant to SDSA's and its client's specific business needs.

17.     Thus, prior to entering into the License Agreement with SDSA, WinMagic was provided necessary details about SDSA's and its client's business operations from which it should have been able to make certain determinations about the operability and compatibility of the SecureDoc solution for their business needs.

**B.     WinMagic's Solicitations of SDSA to Acquire SecureDoc**

18.     After discussing the appropriateness of SecureDoc for SDSA's and its client's business operations, WinMagic first sent SDSA representatives an e-mail containing a "testing license activation" hyperlink that allowed SDSA to conduct limited beta testing of the SecureDoc technology solution before acquiring any licenses for the SecureDoc solution for its broader operations in or about November 2015.

19.     Almost immediately after receiving the "testing license activation" hyperlink from WinMagic, SDSA's system engineers encountered issues with SecureDoc that they brought to the attention of their counterparts at WinMagic.

20.     For example, WinMagic could not configure the SecureDoc solution to be compatible with the very encryption requirements that SDSA previously identified as a

mandatory component of SDSA's and its client's business operations based upon the requirements of their respective parent companies.

21.     Provided with ample opportunity to remedy the issues encountered with SecureDoc, WinMagic's technicians instead chose to attempt resolving this problem by testing the SecureDoc solution against a configuration of the encryption software that WinMagic knew SDSA and its client could not use in their business operations.

22.     When WinMagic's technicians attempted to resolve the noted issues with SecureDoc standard configuration that SDSA's system engineers identified, WinMagic advised SDSA that WinMagic could not resolve the incompatibility between the SecureDoc standard configuration and the encryption configuration that SDSA and its client were required to use in their business operations.

23.     Instead, WinMagic misrepresented that the SecureDoc standard configuration solution would eventually be compatible with the encryption configuration employed by SDSA and its client.

24.     In reality, WinMagic knew that it did not have the ability to make SecureDoc work with the encryption configuration employed by SDSA and its client, but nonetheless continued to suggest that it would through its actions, affirmative representations, and omissions.

25.     In or about April 2016, after two months of working with WinMagic's technicians to resolve the outstanding issues that SDSA encountered with SecureDoc through beta testing, SDSA was led to believe that the issues it was encountering with SecureDoc were resolved and that SDSA and its client would be able to use SecureDoc in their business operations if SDSA elected to move forward with a broader licensure acquisition with WinMagic for the SecureDoc solution.

**C.     The License Agreement Between SDSA and WinMagic**

26.     On or about April 25, 2016, SDSA and WinMagic entered into the License Agreement, which memorialized SDSA's formal acquisition of licenses for the SecureDoc solution from WinMagic for the first time beyond mere test licenses that were initially provided for the limited purpose of beta testing.

27.     Under the terms of the License Agreement, WinMagic was required to provide SDSA with each and every one of the Deliverables listed on Exhibit A-1 of the License Agreement, as specifically enumerated and agreed upon by the parties.  (*See* Exhibit A, License Agreement at ¶3.1).

28.     In anticipation of WinMagic's provision of the Deliverables to SDSA, SDSA paid WinMagic $277,100 by wire transfer.  (*See e.g.* Exhibit A, License Agreement at Ex. A-1 and B).

29.     Within the License Agreement, the parties specifically and unequivocally agreed that "delivery," as that term is used in the License Agreement to trigger certain dispositive refund and other warranty provisions, would not be complete until WinMagic provided SDSA with each and every one of the clearly enumerated Deliverables contained in the list found at Exhibit A-1 to the License Agreement.

30.     The License Agreement further states that SDSA's "Acceptance" of the Deliverables, as the term "Acceptance" is used in the License Agreement, is deemed to be automatic if SDSA did not specifically reject or otherwise report issues with the Deliverables within thirty (30) days of delivery.

31.     The parties agreed to an express warranty provision in the License Agreement which states:

> For a period of ninety (90) days following Acceptance, [SecureDoc] shall materially and substantially conform to the (i) Specifications set forth in Exhibit A and (b) Documentation. [WinMagic] shall upon receipt of written notice (such notice may be in e-mail or other electronic format) promptly correct any and all material and substantial nonconformities, but in no event longer than ninety (90) days from the date of notice of such nonconformity.  Correction may include, at [WinMagic's] option, replacement of [SecureDoc] with similar or better functionality as the software being corrected.  Should [WinMagic] fail, after being so notified, to correct any such material and substantial nonconformities within the period set forth above, [SDSA] may immediately terminate [the License Agreement] and [WinMagic] shall refund the license fees paid for such nonconforming Software hereunder[.]

(*See* Exhibit A, License Agreement at 6.2.2).

## D.     WinMagic's Failure at Delivery of the Goods and Services Provided for Under the License Agreement Prior to Late September 2016

32.     WinMagic sent SDSA an e-mail in April 2016 that would allow SDSA to activate a discrete software component of the SecureDoc solution.

33.     WinMagic's provision of a mere activation code for a discrete software component of the SecureDoc solution was not "delivery," as that term is used under the License Agreement, because WinMagic had not yet provided SDSA with each and every one of the Deliverables provided for in Exhibit A-1 to the License Agreement at that time.

34.     Indeed, WinMagic did not provide SDSA with the proper specifications for the hardware necessary to run the software components of the SecureDoc solution until several months later, in or about August 2016.

35.     Thus, at most, WinMagic's April 2016 e-mail represents only a partial "delivery" by WinMagic of the SecureDoc solution provided for under the terms of the License Agreement.

36.     By the express terms of the License Agreement, delivery is not complete until each and every one of the Deliverables provided for in Exhibit A-1 to the License Agreement are furnished to SDSA by WinMagic.

37.     Prior to WinMagic's provision of installation and consulting services on-site at SDSA's facilities, as agreed upon in the License Agreement, SDSA could not utilize the SecureDoc solution for its intended purposes.

38.     WinMagic's technicians did not begin to provide contractually agreed-upon five (5) days of installation and consulting services at SDSA's facility for SecureDoc until on or about September 19, 2016.

39.      WinMagic did not complete its provision of the contractually agreed-upon five (5) days of installation and consulting services at SDSA's facility for SecureDoc until on or about at least September 27, 2016.

40.     Accordingly, prior to on or about at least September 27, 2016, WinMagic had not completed delivery of the Deliverables, as the term "delivery" is used under the License Agreement.

41.     Because WinMagic had not completed delivery of the Deliverables prior to September 27, 2016, at the earliest, the expiration date for the express warranty provision in the License Agreement was not triggered earlier than that date.  (See Exhibit A, License Agreement at 6.2.2).

**E.     SDSA Repeatedly Reports Significant Issues with SecureDoc to WinMagic and Provides WinMagic with Ample Opportunity to Cure Noted Issues**

42.     Almost immediately after WinMagic's technicians began installing and configuring SecureDoc onto SDSA's client's computer systems on or about September 20, 2016, SDSA provided WinMagic with written notice of serious issues with SecureDoc.

43.     The issues with SecureDoc that SDSA identified were so severe that SDSA was wholly unable to use the technology solution for any purpose.

44.     As required of it under the terms of the License Agreement, SDSA provided WinMagic with every opportunity to cure the issues with SecureDoc that SDSA's representatives identified to WinMagic representatives.

45.     However, WinMagic could not and did not resolve the noted issues, despite a period of time in excess of three (3) months having elapsed since such issues were reported by SDSA to WinMagic after WinMagic's technicians began installation and configuration.

**F.     SDSA Cancels the License Agreement and Requests a Refund from WinMagic Pursuant to the Express Warranty Provision of the License Agreement After Providing WinMagic with Greater Than the Cure Period Called for Under the License Agreement**

46.     On December 20, 2016, ninety-one (91) days after first providing written notice of the problems with SecureDoc to WinMagic on September 20, 2016 and after WinMagic was provided every opportunity to cure same, SDSA cancelled the License Agreement and demanded a full refund of all monies paid to WinMagic by SDSA for SecureDoc, consistent with the express warranty provision contained within the License Agreement.

47.     WinMagic was afforded more than the requisite cure period called for under the terms of the License Agreement, specifically ninety (90) days, but still failed to remedy the issues noticed by SDSA.

48.     SDSA requested a full refund in the amount of $277,100, representing the sum that SDSA paid to WinMagic for the SecureDoc Deliverables that are spelled out in Exhibit A-1 of the License Agreement.

49.     Under a plain reading of the express warranty provision contained in the License Agreement, WinMagic was required to provide a full refund to SDSA in the amount requested.

50.     To date, WinMagic has failed and refused to provide a full refund of the $277,100 that SDSA paid to WinMagic for SecureDoc.

51.     To date, WinMagic continues to wrongfully retain a total of $277,100 to which SDSA is entitled.

## FIRST COUNT
### (Breach of Express Warranty)

52.     SDSA incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

53.     On September 20, 2016, within the deadlines set forth in the express warranty provision of the License Agreement, SDSA provided WinMagic with written notice that SecureDoc was materially and substantially nonconforming, and that the SDSA was unable to use SecureDoc for its business operations and its client's business operations, as WinMagic had promised and represented would be possible.

54.     The License Agreement contains an express warranty provision that states, in relevant part, that, upon receipt of written notice, WinMagic would promptly correct any and all material and substantial nonconformities with SecureDoc within ninety (90) days from the date of notice of such nonconformity.  (*See* Exhibit A, License Agreement at 6.2.2).

55.     The License Agreement further states that "Should [WinMagic] fail, after being so notified, to correct any such material and substantial nonconformities within the [90 day period], [SDSA] may immediately terminate [the License Agreement] and [WinMagic] shall refund the license fees paid for such nonconforming Software hereunder[.]"  (*See* Exhibit A, License Agreement at 6.2.2).

56. The express warranty was an integral part of the License Agreement, in that it provided SDSA with security and assurances from WinMagic that SecureDoc would perform in accordance with SDSA's expectations.

57. As required under the License Agreement, SDSA provided WinMagic with every opportunity to cure the issues that SDSA reported with respect to the SecureDoc solution, and, in fact, SDSA provided WinMagic with greater than the cure period required under the License Agreement.

58. WinMagic breached the express warranty in the License Agreement because, after failing to resolve the noted issues with the SecureDoc solution within ninety (90) days of SDSA reporting those issues to WinMagic, WinMagic failed and refused to provide SDSA with a full refund of the $277,100 paid by SDSA to WinMagic pursuant to the License Agreement, as the express warranty provision of the License Agreement requires.

59. As a direct and proximate result of WinMagic's breach of the express warranty provision contained in the License Agreement, SDSA has incurred damages that were reasonably foreseeable by WinMagic.

**WHEREFORE**, SDSA respectfully requests that this Court enter judgment in its favor and against WinMagic, providing SDSA with the following relief:

a) Compensatory damages, incidental damages and consequential damages;

b) Costs, interest and reasonable attorneys' fees;

c) Pre and post judgment interest; and

d) Such other relief as the Court deems just and equitable.

## SECOND COUNT
### (Breach of Implied Warranty)

60.     SDSA incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

61.     SDSA made it known to WinMagic that SDSA intended to use SecureDoc for a specific purpose within the scope of its business operations.

62.     SDSA relied upon WinMagic's knowledge and experience with SecureDoc to confirm that SecureDoc would be suitable for use in SDSA's intended purpose.

63.     WinMagic did not exclude or modify any warranty regarding SecureDoc in its dealings with SDSA.

64.     WinMagic breached the implied warranty for fitness for a particular purpose and the implied warranty of merchantability because SecureDoc had obvious deficiencies and was not fit for SDSA's intended use.

65.     As a direct result of WinMagic's breaches of the implied warranty of fitness for a particular purpose and the implied warranty of merchantability, SDSA has incurred damages that were reasonably foreseeable by WinMagic.

**WHEREFORE**, SDSA respectfully requests that this Court enter judgment in its favor and against WinMagic, providing SDSA with the following relief:

a)     Compensatory damages, incidental damages and consequential damages;

b)     Costs, interest and reasonable attorneys' fees;

c)     Pre and post judgment interest; and

d)     Such other relief as the Court deems just and equitable.

12

## THIRD COUNT
### (Violation of the New Jersey Consumer Fraud Act)

66.     SDSA incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

67.     SDSA is a proper consumer, as defined by the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*. (the "Consumer Fraud Act").

68.     WinMagic is a "seller" of goods, as defined by the Consumer Fraud Act.

69.     WinMagic's conduct violated the provisions of the Consumer Fraud Act, in that WinMagic engaged in unconscionable commercial practices by licensing SecureDoc, knowing that the SecureDoc solution would: (i) not live up to its representations; (ii) could not be replaced and/or could not be properly repaired within the warranty period; and (iii) was subject to an express warranty that, by its own terms, could never result in a refund because it gave no conceivable opportunity for a claim to be made or discovery of defects within the warranty period.

70.     Moreover, no length of warranty – either one day or 100 years – would have protected SDSA from being fraudulently induced by WinMagic to purchase SecureDoc, because WinMagic knowingly cannot repair SecureDoc or otherwise conform SecureDoc for use in SDSA's business operations.

71.     WinMagic intentionally employed such fraudulent, unconscionable commercial practices as a means by which to entice SDSA to do business with WinMagic, to the exclusion of WinMagic's competitors.

72.     At the time that WinMagic made its fraudulent misrepresentations to SDSA, WinMagic knew that those representations were false.

73.     SDSA relied upon WinMagic's misrepresentations by, *inter alia*, refraining from doing business with WinMagic's competitors.

74.     As a result of WinMagic's illegal and fraudulent conduct in violation of the Consumer Fraud Act, SDSA has sustained ascertainable losses, including, but not limited to, WinMagic's failure to return the monies paid by SDSA to WinMagic under the License Agreement.

**WHEREFORE**, SDSA respectfully requests that this Court enter judgment in its favor and against WinMagic, providing SDSA with the following relief:

a)      Compensatory damages, incidental damages and consequential damages;

b)      Treble damages and punitive damages;

c)      Costs, interest and reasonable attorneys' fees;

d)      Pre and post judgment interest; and

e)      Such other relief as the Court deems just and equitable.

## FOURTH COUNT
### (Fraudulent Concealment)

75.     SDSA incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

76.     Between October 2015 and April 2016, WinMagic specifically represented to SDSA that SecureDoc would be suitable for SDSA's business needs and the business needs of SDSA's client.

77.     WinMagic made such representations to SDSA, despite knowing: (i) that SecureDoc would not be suitable for SDSA and its client's business needs; and (ii) that SecureDoc was not compatible with the encryption configuration that WinMagic knew was mandated by the respective parent companies of SDSA and its client.

78.     SDSA provided extensive and detailed information to WinMagic about SDSA's and its client's operations under the protections of the parties' Non-Disclosure Agreement.

79.     Despite the extensive and detailed disclosures to WinMagic under the Non-Disclosure Agreement, WinMagic's representations, as well as WinMagic's conduct, induced detrimental reliance by SDSA.

80.     WinMagic made these material misrepresentations and/or omitted material facts with the knowledge that they were false and/or misleading.

81.     At the time that WinMagic made its misrepresentations and omissions of material fact, WinMagic had no intention to deliver a functioning version of SecureDoc that would be compatible with the encryption configuration that WinMagic knew was required by SDSA and its client.

82.     SDSA has suffered, and continues to suffer, damages as a result of WinMagic's fraudulent conduct.

**WHEREFORE**, SDSA respectfully requests that this Court enter judgment in its favor and against WinMagic, providing SDSA with the following relief:

  a) Compensatory damages, incidental damages and consequential damages;

  b) Punitive damages;

  c) Costs, interest and reasonable attorneys' fees;

  d) Pre and post judgment interest; and

  e) Such other relief as the Court deems just and equitable.

### FIFTH COUNT
### (Negligent Misrepresentation)

83.     SDSA incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

84.     If WinMagic's misrepresentations and omissions were not knowing, WinMagic negligently made a false communication of material fact.

85.     Based upon WinMagic's expressed experience with deploying SecureDoc to fit a host of customer-driven needs, SDSA justifiably relied upon WinMagic's misrepresentations.

86.     As a direct and proximate result of WinMagic's negligent misrepresentations, SDSA has suffered, and continues to suffer, damages.

**WHEREFORE**, SDSA respectfully requests that this Court enter judgment in its favor and against WinMagic, providing SDSA with the following relief:

      a)     Compensatory damages, incidental damages and consequential damages;

      b)     Costs, interest and reasonable attorneys' fees;

      c)     Pre and post judgment interest; and

      d)     Such other relief as the Court deems just and equitable.

### SIXTH COUNT
**(Unjust Enrichment)**

87.     SDSA incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

88.     Pursuant to the License Agreement, SDSA paid $277,100 to WinMagic by wire transfer.

89.     In return for its payment of $277,100 to WinMagic, SDSA expected to receive a functioning version of SecureDoc, including each and every one of the Deliverables set forth in Exhibit A-1 of the License Agreement.

90.     WinMagic has failed to provide SDSA with a functioning version of SecureDoc.

91.     As a result, WinMagic has been unjustly enriched at SDSA's expense and to SDSA's detriment.

16

92.     Retention of the benefits bestowed upon WinMagic without compensation to SDSA would be unjust under the circumstances.

93.     As a direct and proximate cause of WinMagic's unjust enrichment, SDSA has suffered damages.

**WHEREFORE**, SDSA respectfully requests that this Court enter judgment in its favor and against WinMagic, providing SDSA with the following relief:

      a)    Compensatory damages, incidental damages and consequential damages;

      b)    Costs, interest and reasonable attorneys' fees;

      c)    Pre and post judgment interest;

      d)    Such other relief as the Court deems just and equitable.

<u>**SEVENTH COUNT**</u>
**(Breach of Covenant of Good Faith and Fair Dealing)**

94.     SDSA incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

95.     As a party to a contractual relationship, WinMagic owed SDSA an implied duty of good faith and fair dealing.

96.     The implied duty of good faith and fair dealing provides that each party to a contractual relationship will not do anything that will deprive the other parties of the benefits of their bargain, and a breach of this duty gives rise to an action for damages.

97.     WinMagic has precluded SDSA from realizing the full benefit of its bargain under the License Agreement.

98.     As a result of WinMagic's breach of the implied duty of good faith and fair dealing, SDSA has suffered substantial damages.

**WHEREFORE**, SDSA respectfully requests that this Court enter judgment in its favor and against WinMagic, providing SDSA with the following relief:

a)   Compensatory damages, incidental damages and consequential damages;

b)   Costs, interest and reasonable attorneys' fees;

c)   Pre and post judgment interest;

d)   Such other relief as the Court deems just and equitable.

**FOX ROTHSCHILD LLP**
*Attorneys for plaintiff Samsung SDS America, Inc.*

By:    /s/ Matthew S. Adams
       Matthew S. Adams
       Jordan B. Kaplan

Dated: March 1, 2018

# EXHIBIT A

**SAMSUNG SDS AMERICA, INC.**

**SOFTWARE LICENSE AGREEMENT - INBOUND**

THIS SOFTWARE LICENSE AGREEMENT ("**Agreement**") is made as of this 25th day of April, 2016 ("**Effective Date**") by and between Samsung SDS America, Inc., having a place of business at 100 Challenger Rd., 6th Fl., Ridgefield Park, NJ 07660 ("**SDSA**"), and WinMagic Inc. ("**Licensor**") having its principle place of business at 5600A Cancross Court, Mississauga, Ontario, Canada L5R 3E9.

WHEREAS, Licensor is the owner of certain computer software and accompanying documentation as more specifically described herein, and desires to license the same to SDSA on the terms and subject to the conditions set forth herein; and

WHEREAS, SDSA desires to obtain and use such software and documentation on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      **Definitions**

For purposes of this Agreement, the following terms shall have the following meanings and shall include the plural as well as the singular:

1.1      [Reserved.]

1.2      "**Computer System**" means computer central processing units and peripheral equipment, including without limitation, any cluster, combination or network of such central processing units and peripheral equipment which are under common control, and which are now, or may in the future be, owned or operated by or for SDSA.

1.3      "**Deliverables**" means all Software, Documentation, and other materials delivered to SDSA by Licensor under this Agreement and described in Exhibit A.

1.4      "**Documentation**" means user manuals and other written materials that relate to particular Software, including materials such as logic manuals, flow charts, and principles of operation.  Documentation shall also include any Maintenance Modifications or Enhancements thereto created by Licensor from time to time, and such additional materials as may be described in Exhibit A.

1.5      "**Enhancements**" means changes or additions, other than Maintenance Modifications, to Software and related Documentation, including all new releases, that improve functions, add new functions, or significantly improve performance by changes in system design or coding that are made generally commercially available as part of Support.

1.6      "**Error**" means any error, problem, or defect resulting from (i) an incorrect functioning of Software or (ii) an incorrect or incomplete statement or diagram in Documentation, if such an error, problem, or defect renders the Software inoperable, causes the Software to fail to meet the specifications thereof, causes the Documentation to be inaccurate or incomplete in any material respect, causes incorrect results, or causes incorrect functions to occur when any such materials are used.

1.7      "**Maintenance Modifications**" means any modifications or revisions, other than Enhancements, to Software or Documentation that correct Errors, support new releases of the operating systems with which the Software is designed to operate, support new input/output devices, or provide other incidental updates and corrections that are made generally commercially avaiable as part of Support.

1.8      "**Permitted Contractors**" means each person or entity who contracts with SDSA to provide consulting, programming, or facilities management services; provided that, in the absence of further authorization from Licensor, to qualify as a Permitted Contractor such person or entity must provide such services insofar as they pertain to the Software solely to SDSA for its sole account, and SDSA must cause each such person or entity to enter into, be bound by, and comply with, the appliacable restrictions and obligations under this Agreement.



1.9 **"Permitted Processors"** means each person or entity who contracts with SDSA to provide platform support or processing services by installing the Software on computers operated by such person or entity and executing the Software or manipulating related input or output in support of the purposes authorized hereunder for SDSA's use of the Software; provided that, in the absence of further authorization from Licensor, to qualify as a Permitted Processor such person or entity must provide such services insofar as they pertain to the Software solely to SDSA for its sole account, and SDSA must cause each such person or entity to enter into, be bound by, and comply with the applicable restrictions and obligations under this Agreement.

1.10 **"Software"** means Licensor's software products as set forth in Exhibit A (Software Schedule), in executable form, including updates, and revisions thereto. Software shall also include all Enhancements and Maintenance Modifications created by Licensor from time to time. Licensor and SDSA may, from time to time, enter into additional Exhibit A's under this Agreement and each such additional Exhibit A shall be sequentially numbered (e.g., Exhibit A-2, A-3, A-4, etc.). Each Exhibit A must be signed by the authorized representatives of both parties in order to be effective. No Exhibit A subsequent to any previous Exhibit A shall affect any previous Exhibit A, unless expressly stated to the contrary in such subsequent Exhibit A. Each referance to Exhibit A in this Agreement shall mean the applicable Exhibit A.

1.11 **"Specifications"** means the description of the performance, functions and other requirements for the Software set forth in Exhibit A.

2. **License Grant; Fees and Payment**

2.1 <u>License Grant</u>.

    2.1.1 Licensor hereby grants to SDSA a worldwide, non-exclusive, fully paid-up, license for the term set forth in Exhibit A, to use (where such use includes, without limitation, the right to use for business and internal development purposes), copy, install, and display the Software, for production and backup use, on any SDSA Computer Systems, including without limitation, via remote access, subject to the applicable unit quantities set forth in Exhibit A.

    2.1.2 SDSA shall have the right to engage Permitted Contractors and Permitted Processors to operate the Software on behalf of SDSA.

    2.1.3 SDSA shall have the right to use the Software in connection with any joint venture, partnership or strategic business or marketing alliance in which SDSA is a partner, joint venture, or participant.

2.2 <u>Scope</u>.

    2.2.1 SDSA shall have the right to change the configuration of the Computer Systems on which the Software is installed, and may install the Software on new or additional compatible Computer Systems without payment of an "upgrade fee" or other charges as a result of such actions.

    2.2.2 SDSA shall have the right to utilize the Software at one or more locations, whether or not owned or operated by SDSA, during the testing or operation of a disaster recovery plan.

    2.2.3 SDSA shall have the right to utilize the Software for the benefit of the SDSA Customer set forth in the Exhibit A.

2.3 <u>License Fee</u>.

    2.3.1 In consideration of the rights provided herein, SDSA agrees to pay Licensor the fees and charges set forth in Exhibit A. Unless otherwise expressly set forth in Exhibit A, all license fees are one-time, fully paid-up license fees, and no additional license fees of any kind shall be due from SDSA Licensor to keep the licenses granted herein in full force and effect. The license fees are exclusive of any applicable taxes and SDSA is required to pay such amounts, as applicable, in addition to the license fees.

    2.3.2 The fees for any additional Software licensed and/or the charges for any additional Maintenance and Support Services purchased by SDSA under this Agreement under Exhibit A's subsequent to Exhibit A-1 shall be provided by Licensor as at least as favorable a discount as the discount(s) in effect under Exhibit A-1.

Confidential

2.4     Payment.  Licensor shall submit invoices to SDSA for payment for such license fees and any other charges due hereunder, which shall be payable within thirty (30) days from the date of receipt of such invoice. Whenever an invoice includes charges for time and materials, the invoice shall indicate the names, skill levels, and hours of the Licensor's employees performing the work.   Each invoice shall separately set forth travel expenses, if any, authorized by SDSA for reimbursement.   Supporting documentation (e.g., receipts for air travel, hotels, and rental cars) called for by SDSA's standard reimbursement policies shall accompany any such invoice.

2.5     Expenses.  Except as expressly provided in this Agreement or as otherwise agreed to by the parties in writing, Licensor shall bear all of its own expenses arising from performance of its obligations under this Agreement, including, without limitation, expenses for transportation, living facilities, work spaces, utilities, management, clerical and reproduction services, supplies, and the like.

3.      **Delivery; Installation and Acceptance**

3.1     Delivery and Installation.  Licensor shall promptly deliver all Deliverables specified in Exhibit A, (including all subsequent Enhancements and Maintenance Modifications thereto) to SDSA for installation and testing. SDSA shall, at its sole option, install and test the Software for acceptance as set forth in Section 3.2 (Acceptance).  Any hardware or other requirements for installation shall be set forth in Exhibit A.

3.2     Acceptance.

3.2.1   Upon receipt of the Deliverables, and no later than thirty (30) days after receipt of the Deliverables, SDSA shall complete its testing of the Deliverables to determine whether they meet the Specifications and any other requirements set forth herein or in any attachments hereto. For greater certainty, if SDSA does not complete its testing within thirty (30) days after receipt of the Deliverables, the Deliverables will be deemed as accepted under the Agreement.

3.2.2   Unless otherwise specified in an attachment hereto, such testing shall be conducted as follows:

(i)      Unless otherwise agreed by the parties in writing, SDSA will notify Licensor, in writing, that it is accepting or rejecting the Deliverables within ten (10) business days after completing the acceptance tests specified in the Acceptance Test Plan for the Deliverables contained in Exhibit A.   For greater certainty, if SDSA does not notify Licensor in writing of SDSA's acceptance or rejection of the Deliverables within the ten (10) business days referred to above in this sub-section, the Deliverables will be deemed as accepted under the Agreement. Any notice of rejection shall set forth the grounds for rejection.  Licensor shall use its best efforts to remedy any failures of the Deliverables to meet the Specifications within ten (10) business days from the date of the rejection notice and shall promptly deliver corrected Deliverables to SDSA.

(ii)     Unless otherwise agreed by the parties in writing, upon receipt of corrected Deliverables, SDSA shall have fifteen (15) business days within which to re-test them and inform Licensor of its acceptance or rejection, again using the acceptance tests specified in the Acceptance Test Plan for the Deliverables  For greater certainty, if SDSA does not notify Licensor in writing of SDSA's acceptance or rejection of the corrected Deliverables within the fifteen (15) business days referred to above in this sub-section, the corrected Deliverables will be deemed as accepted under the Agreement. This procedure may be repeated any number of times; provided, however, if SDSA detects failures of the Deliverables to meet the Specifications after it has re-tested the Deliverables twice, SDSA shall thereafter have the right to terminate this Agreement, or the applicable Exhibit A-x, upon written notice to Licensor.  Upon such termination, then, in addition to any other right or remedy it may have, SDSA shall be entitled to a full refund of all license fees and/or maintenance and support charges paid to Licensor under that Exhibit A prior to such rejection, and shall SDSA have no further payment obligations under that Exhibit A.

3.3     Acceptance. When the Deliverables meet the Specifications after performance of the applicable acceptance tests, as solely determined by SDSA, SDSA shall accept the Deliverables by issuing a written confirmation of acceptance to Licensor ("**Acceptance**"), which shall be effective as of the date of successful completion of the tests.

3.4     Platform Migration. SDSA may use the Software on any operating system platforms currently supported by Licensor at no additional charge. In addition SDSA may migrate its use of the Software from an operating system platform currently supported by the Licensor for use on any other operating system platform Licensor may develop in

the future at no additional charge.  Upon completion of such migration, SDSA shall return the previously used Software that SDSA is migrating from, or certify its destruction in writing to Licensor.

3.5    <u>End of Life Software Exchange Right</u>. For purposes of this sub-section 3.5 (<u>End of Life Software Exchange Right</u>) only, the term "Program" shall mean the Software and the term "Discontinued Program" shall mean the Software for which SDSA has a valid license under this Agreement for which Licensor discontinues the general availability of Maintenance Services or for which Licensor otherwise no longer makes generally commercially available.  If Licensor either: (i) markets another software product under a different name as a replacement and/or successor for the Discontinued Program, or (ii) markets the Discontinued Program under two or more generally commercially available separately named and/or priced other software products where such two or more separately named and/or priced other software products have combined like functionality of the Program, and Licensor discontinues the general availability of Support for the Discontinued Program, then SDSA shall be entitled to exchange the Discontinued Program for the replacement and/or successor software product (as described in sub-section (i) herein) or the separately named and/or priced software products (as described in sub-section (ii) herein), as applicable, without payment of any additional license fees.  Upon completion of any such exchange, SDSA shall return the Discontinued Program to Licensor or certify its destruction in writing to Licensor.

## 4.    Training; Maintenance and Support

4.1    <u>Maintenance and Support Services</u>.  Licensor shall provide to SDSA the maintenance and support services as are described in Exhibit B (Maintenance and Support Services) for the fees set forth in Exhibit A.

4.2    <u>No Additional Charges</u>. Except for SDSA-approved travel and other out-of-pocket expenses, there shall be no additional charges for maintenance or support services based on the distance of the site from Licensor.  There shall also be no additional charge for maintenance or support services unless such charges are set forth in Exhibit A or are approved in writing by a duly authorized representative of SDSA.

## 5.    Ownership and Confidentiality

5.1    <u>Ownership</u>.  All right, title, and interest in and to the Software shall remain with Licensor.  This Agreement does not provide SDSA title or ownership of the Software. All copies of the Software made by SDSA for back-up, archival and/or testing purposes are the property of Licensor.

5.2    <u>Obligation of Confidentiality</u>.

    5.2.1    Each party acknowledges and agrees that during the term of this Agreement, it may have access to certain Confidential Information (as that term is defined in this section) belonging to the other party.  Each party agrees that it shall keep Confidential Information in confidence in accordance with the terms of this sub-section 5.2 (Obligation of Confidentiality).   **"Disclosing Party"** shall mean the party disclosing Confidential Information and **"Receiving Party"** shall mean the party to whom Confidential Information is disclosed. "**Confidential Information**" shall mean all non-public information including but not limited to information concerning the products, services, sales, performance, plans, strategies, customers, financial or human resources, processes, management, contracts, project documentation, software and hardware, technical data, drawings, schematics, know-how, ideas and inventions (whether patentable or not) of Disclosing Party. Confidential Information may be in writing, oral, visual, or in other tangible, or intangible, form. Confidential Information shall be marked, or otherwise identified, as confidential or proprietary, or consist of information which reasonably should be considered as confidential or proprietary from its nature or from the circumstances surrounding its creation or disclosure. Disclosing Party's Confidential Information shall also include (i) the confidential information of its affiliates, subsidiaries, parent, and third parties, for which Disclosing Party is obligated to hold in confidence, and (ii) confidential information of Disclosing Party disclosed to Receiving Party on behalf of Disclosing Party by Disclosing Party's affiliates, subsidiaries, parent, consultants, or agents (collectively, **"Representatives"**), provided that such information as described in sub-clauses (i) and (ii) of this sentence would otherwise fall within the definition of Confidential Information set forth in this paragraph.

    5.2.2    Receiving Party shall hold and keep in strict confidence all Confidential Information of Disclosing Party using the same means it uses to protect its own Confidential Information and in any event not less than reasonable means to protect Disclosing Party's Confidential Information from unauthorized disclosure or use.

    5.2.3    Confidential Information shall not include any information to the extent that it:

(i)      is made public by the Disclosing Party, or is in the public domain otherwise than as a result of a breach of this Agreement;

(ii)     was in the possession of Receiving Party before its receipt of the Confidential Information whether directly or indirectly from Disclosing Party;

(iii)    is disclosed to Receiving Party in good faith by a third party who had a lawful right to make such disclosure without breach of any confidentiality obligation; or

(iv)    is independently developed by Receiving Party without use of the Confidential Information.

5.2.4    Receiving Party may make disclosures of Confidential Information, to the minimum extent legally required, in accordance with a judicial or other governmental order, provided Receiving Party shall (i) give Disclosing Party reasonable written notice prior to disclosure pursuant to such order (unless prohibited by such order), (ii) use diligent efforts to limit disclosure and to obtain confidential treatment, or a protective order, and allow the Disclosing Party to participate in the proceedings, and (iii) comply with any applicable protective order or equivalent.

5.2.5    Receiving Party shall only disclose Confidential Information of Disclosing Party to those of its Representatives who (i) have a need to know and (ii) are under obligations of confidentiality, non-disclosure, and use restriction, substantially as restrictive as those set out in this Agreement. Receiving Party shall take all reasonable measures (including, but not limited to, court proceedings in the appropriate circumstances), at its own expense, to restrain Representatives from unauthorized disclosure or use of Confidential Information. Receiving Party shall be fully liable to the Disclosing Party for any improper use or disclosure of Confidential Information by Receiving Party's Representatives. Receiving Party shall, upon knowledge of any unauthorized disclosure, failure to hold in confidence, misappropriation, or misuse, by any of its Representatives of any Confidential Information, immediately inform the Disclosing Party in a writing containing reasonable details about the unauthorized act or omission.

5.2.6    Upon request by and at the election of Disclosing Party at any time, Receiving Party shall within fifteen (15) days from the date of such request return or destroy all Confidential Information of Disclosing Party to Disclosing Party and all documents containing any such Confidential Information and any and all copies or extracts thereof. Receiving Party shall also, at the same time, remove and delete all electronic copies of such Confidential Information from all storage media and furnish written verification of complete removal and deletion to Disclosing Party.

5.2.7    [Reserved.]

5.2.8    [Reserved.]

5.2.9    With respect to any Confidential Information provided to Receiving Party, the confidentiality, non-disclosure, and use restriction terms of this Agreement shall survive any expiration or termination of this Agreement until such time as such Confidential Information falls into one of the exceptions in sub-section 5.2.3 above.

5.2.10   Receiving Party acknowledges that Confidential Information constitutes valuable proprietary information and as such there can be no adequate remedy at law for any breach of this Agreement and that a breach may result in irreparable harm to Disclosing Party. Receiving Party therefore agrees that upon any breach or threatened breach of this Agreement, Disclosing Party shall be entitled, in addition to any other remedies it may have at law or in equity, to seek injunctive, prohibitory or other urgent relief against such breach or threatened breach and Receiving Party and its Representatives shall not plead as a defense to such action by Disclosing Party that Disclosing Party has an adequate remedy or other remedies at law.

5.3    Restricted Use.  SDSA may not modify, amend, reverse engineer, decompile, disassemble, or distribute (whether commercially, for-profit or otherwise), sublicense, resell, or transfer (except to Permitted Processors or Permitted Contractors or SDSA's customer, Samsung Electronics America, Inc. ("SEA")) the Deliverables or create or compile any software to work in conjunction with or as a companion to the Software, including, but not limited to, any installed programs without the prior written consent of Licensor which consent may be withheld by Licensor at its sole and exclusive discretion. The Software may be copied by SDSA for backup and archival purposes. SDSA's use of any open source software is governed by the open source licenses, as set forth in Exhibit A-1.

5.4    Compliance Certification.  SDSA agrees that upon Licensor's written request, SDSA will provide Licensor with a certification of compliance with the terms of this Agreement.

6.      **Representations and Warranties; Indemnification; Limitation of Liability**

6.1     <u>Warranty of Title and Non-infringement</u>.  Licensor represents and warrants to SDSA that:

      6.1.1     Licensor has and will have title to and sole ownership of the Deliverables, except any open source software identified in Exhibit A-1 that may accompany the Deliverables;

      6.1.2     Licensor has and will have the right to convey the licenses granted herein, free of any liens, claims or encumbrances; and,

      6.1.3     None of the Deliverables infringe any patents, copyrights, trademarks, or other intellectual property rights (including trade secrets), privacy or similar rights of any third party, nor has any claim of such infringement been threatened or asserted.

6.2     <u>Warranties of Conformity, Performance and Compliance</u>.  Licensor represents and warrants to SDSA that:

      6.2.1     All services shall be provided in a workmanlike manner and with professional diligence and skill;

      6.2.2     For a period of ninety (90) days following Acceptance, the Software shall materially and substantially conform to the (i) Specifications set forth in Exhibit A and (b) Documentation. Licensor shall upon receipt of written notice (such notice may be in e-mail or other electronic format) promptly correct any and all material and substantial nonconformities, but in no event longer than ninety (90) days from the date of notice of such nonconformity.  Correction may include, at Licensor's option, replacement of the Software with similar or better functionality as the software being corrected. Should Licensor fail, after being so notified, to correct any such material and substantial nonconformities within the period set forth above, SDSA may immediately terminate this Agreement and Licensor shall refund the license fees paid for such nonconforming Software hereunder; and,

      6.2.3     The Software does not and will not contain, at the time issued or delivered by Licensor to SDSA, any program routine, device, or other undisclosed feature, including, without limitation, a time bomb, virus, software lock, drop-dead device, malicious logic, worm, Trojan horse, or trap door, that is designed to delete, disable, deactivate, interfere with or otherwise harm the Software or SDSA's hardware, data, or other software, or that is intended to provide access or produce modifications not authorized by SDSA (collectively **"disabling procedures"**).  Licensor will use its best efforts to detect disabling procedures in the Software, or in software supplied by vendors, licensors, or contractors. Licensor shall take appropriate action to ensure that the Software is free of disabling procedures.  Licensor shall obtain comparable warranties from such other providers. Licensor agrees to notify SDSA in writing immediately upon discovery of any disabling procedures that are or may be included in the Software as delivered to SDSA by Licensor, and, if disabling procedures are discovered or reasonably suspected to be present in the Software, Licensor agrees to take action immediately, at its own expense, to identify and eradicate (or to assist SDSA to identify and eradicate) such disabling procedures.

      6.2.4     The warranty set out in Section 6.2.2 in invalidated to the extent that: (i) SDSA is not the purchaser of the Software license;  (ii) SDSA fails to promptly install a Maintenance Modification issued by Licensor; (iii) the Software or the media upon which the Software is provided is damaged, altered, or affected by accident, neglect, misuse, other abuse or in a manner in breach of this Agreement; or (iv) the claim to defect or error has been caused, in whole or in part, by persons other than Licensor.

THE WARRANTIES SET FORTH IN SECTIONS 6.1 AND 6.2 ABOVE ARE THE ONLY WARRANTIES MADE BY LICENSOR IN RESPECT TO THE DELIVERABLES. LICENSOR MAKES NO OTHER WARRANTIES, EXPRESS, IMPLIED, OR ARISING BY CUSTOM OR TRADE USAGE.

6.3     <u>Indemnification</u>.

      6.3.1     Licensor shall indemnify, defend, and hold harmless, SDSA, and its respective employees, officers, directors, agents, successors and assigns, from and against any claim, loss, damages or liability (i) for bodily injury, including death, and for damage to property, including the property of any of them, incurred by reason of any willful or negligent act of commission or omission of Licensor, its agents or employees, arising out of or taking place in the course of the performance

Page 6 of 18

of this Agreement; or (ii) results from or arises out of the violation of any third party's trade secrets, trademarks, copyright, patent rights or other proprietary rights.  Such obligation shall include all reasonable costs and expenses of any investigation and defense of such claims, including the fees and reasonable expenses of attorneys and experts, etc.  Licensor will have no liability or obligation to SDSA hereunder to the extent any infringement or any assertion, claim or proceeding relating thereto is based upon: (i) the combination of the Software with any other products not furnished by Licensor; or (ii) any addition to or modification of the Software made after installation by any person or entity other than Licensor.

6.3.2   If a temporary or a final injunction is obtained against SDSA's use of the Software by reason of an infringement of the patent, copyright, trademark, trade secret or other proprietary rights of any third party, Licensor will, at its option and expense, promptly either (i) obtain for SDSA sufficient rights to allow SDSA to use the Software as contemplated by this Agreement; or (ii) substitute non-infringing Software, services, and Deliverables, acceptable to SDSA and substantially similar to the Software described in Exhibit A.  In the event that none of the foregoing remedies is available following diligent efforts to obtain them, then Licensor may terminate SDSA's license for the infringing Software and refund to SDSA the license fees paid in respect thereof, less 2% for each complete month since the date of receipt of the Deliverables.

6.3.3   SDSA agrees to (i) promptly notify Licensor in writing of any claim; (ii) at Licensor's request and expense, give assistance reasonably required for the defense of any such claim; and (iii) give Licensor control of the defense and/or settlement of such claim; provided, however, that SDSA may participate in such defense and/or settlement at its option and expense.

6.3.4   For purposes of this Section 6.3 (Indemnification), the term Software shall include Documentation.

**6.4**   Limitation of Liability.

IN NO EVENT SHALL A PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, EXEMPLARY, OR PUNITIVE, DAMAGES, OR ANY LOSS OF PROFITS, LOSS OF SALES, OR LOSS OF REVENUE, AGAINST THE OTHER, EVEN IF THE OTHER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH, WHETHER FORSEEABLE OR UNFORSEEABLE, EXCEPT THE PRECEDING LIMITATION SHALL NOT APPLY TO (a) LICENSOR'S OBLIGATIONS UNDER SECTION 6.3 (INDEMNIFICATION) OR (b) FOR A PARTY'S BREACH OF SECTION 5.2 (OBLIGATION OF CONFIDENTIALITY).  THE CUMULATIVE LIABILITY OF SDSA TO LICENSOR AND OF LICENSOR TO SDSA FOR ALL CLAIMS, LIABILITIES, AND COSTS, ARISING UNDER OR RELATED TO THIS AGREEMENT, INCLUDING ANY CAUSE OF ACTION, WHETHER IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, SHALL NOT EXCEED THE TOTAL AMOUNT OF LICENSE FEES PAID TO LICENSOR BY SDSA IN THE TWELVE (12) MONTHS PRECEDING THE ACTS OR OMISSIONS THAT GAVE RISE TO ANY SUCH CLAIM, LIABILITY, OR COST EXCEPT THE PRECEDING LIMITATION SHALL NOT APPLY TO (a) LICENSOR'S OBLIGATIONS UNDER SECTION 6.3 (INDEMNIFICATION) OR (b) FOR A PARTY'S BREACH OF SECTION 5.2 (OBLIGATION OF CONFIDENTIALITY).  FOR GREATER CERTAINTY, LICENSOR SHALL NOT BE LIABLE FOR LOSS OF DATA IF SDSA OR SDSA CUSTOMER NEGLECTS TO BACK UP THE KEY DATABASE OR PROFILE OR IF PASSWORDS CANNOT BE RECALLED.

**7.**   **Term and Termination**

**7.1**   Term.  This Agreement shall commence on the Effective Date and shall remain in effect for so long as there is a Software Schedule such as the one in the attached Exhibit A in effect unless sooner terminated as provided herein.

**7.2**   Termination by SDSA Without Cause.  SDSA may terminate this Agreement without cause, upon thirty (30) days' prior written notice to Licensor.

**7.3**   Termination in the Event of Breach.  In the event of any material breach of this Agreement by either party, the other party may terminate this Agreement without waiving any remedies or rights available to such other party at law or in equity upon at least thirty (30) days' prior written notice specifying the nature of the breach.  The party in breach shall have the opportunity to cure such breach during such thirty (30) day period if the breach is of a nature that is capable of being cured.

**7.4**   Insolvency.  Either party may immediately terminate this Agreement if the other party is declared insolvent or bankrupt; the property of the other party is assigned for the benefit of creditors, levied upon execution, or seized by virtue of any writ of any court of law; a petition for declaration of bankruptcy or reorganization is filed against the

other party in any court and not dismissed in ninety (90) days; or a trustee or receiver is appointed for the other party.

7.5     Continuing Use and Return of Software.  In the event this Agreement is terminated for any reason, SDSA will cease using the Software, and return and destroy all originals and copies of the Software in its possession. Upon termination SDSA will cease using the Software, and return or destroy all originals and copies of the Software in its possession within thirty (30) days after the effective date of termination.

8.      **Insurance**

8.1     General.  Licensor shall maintain in full force and effect at all times throughout the term of this Agreement, and for a period of four (4) years thereafter, at a minimum, Automobile Liability, Workers' Compensation, Employer's Liability, Commercial General Liability, Errors and Omissions coverage and Umbrella Liability insurance in the following amounts (US dollars):

| CATEGORY | LIMITS OF LIABILITY |
|---|---|
| **Automobile Liability**[1] | |
| Bodily Injury & Property Damage | $1,000,000 Combined Single Limit |
| **Workers' Compensation**[2] | Statutory |
| **Employer's Liability** | |
| Bodily Injury for Disease | $1,000,000 each employee |
| Bodily Injury by Accident | $1,000,000 each accident |
| **Commercial General Liability**[3] | $1,000,000 each occurrence (with $2,000,000 general aggregate) |
| **Errors and Omissions** | $2,000,000 |
| **Umbrella Liability** | $5,000,000 |

1   Including all non-owned and hired vehicles.
2   Vendor will secure from its carrier a waiver of subrogation in favor of SDSA.
3   Including "per location aggregate" endorsement and written on a commercial general liability form or its equivalent.

8.2     Certificates. Certificates of all insurance shall be available for SDSA's review and shall be furnished to SDSA upon request.  SDSA reserves the right at any time to terminate or suspend performance of the maintenance and support services set forth in Exhibit B (Maintenance and Support Services), or any portion thereof, if in SDSA's sole discretion such insurance coverage is inadequate.  Copies of certificates provided to SDSA shall include, at a minimum, the following: (i) the name of the insurance company, policy number, and expiration date; (ii) the coverage required and the limits on each, including the amount of deductibles or self-insured retentions (which shall be for the account of the Vendor); (iii) a statement indicating that SDSA shall receive thirty (30) days' notice of cancellation or significant modification of any of the policies that may affect SDSA's interest; and (iv) a statement confirming that SDSA has been named an additional insured (except for workers compensation) on all policies.

9.      **GENERAL PROVISIONS**

9.1     Assignment.  Neither party shall assign its rights or delegate its obligations under this Agreement without the prior written consent of the other, which consent shall not be unreasonably delayed or withheld.  Either party may, however, assign all of its rights and obligations under this Agreement to an affiliate or to any corporation or other entity, where such assignment is in connection with the sale or transfer of all or a substantial portion of the assets of the business to which this Agreement pertains, or is pursuant to a merger, consolidation, or other

Page 8 of 18

Confidential

reorganization, provided (i) such assignee agrees to observe and be bound by the terms of this Agreement, and (ii) such assignee has assets substantial enough to cover assignee's obligations and liabilities under this Agreement. Each party agrees to promptly notify the other party of any such assignment, in writing, specifying the name and address of the new entity. Any attempted assignment in violation of this Section 9.1 (Assignment) shall be void and of no effect.

9.2     No Waiver.  The parties acknowledge that this Agreement is commercial in nature, and Licensor expressly and irrevocably waives any claim or right that Licensor may have to immunity (whether sovereign immunity or otherwise) for Licensor or with respect to any of Licensor's assets in connection with legal action, award or other proceedings to enforce this Agreement, including, without limitation, immunity from service of process, immunity of any of Licensor's assets from pre  or post judgment attachment or execution and immunity from the jurisdiction of any court or tribunal.  Failure by SDSA to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision.  The waiver by SDSA of any default hereunder shall not be deemed to be a waiver of subsequent defaults of the same or different kind.

9.3     Severability.  If for any reason a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be unenforceable, that provision of this Agreement shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Further, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as part of this Agreement a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

9.4     Force Majeure.  In the event any party hereto is prevented from performing its obligations under this Agreement (such party, the "Nonperforming Party") as a result of any act of God or nature, fire, war, riots, terrorist acts, acts of any civil or military authority, or judicial action, for which a reasonable business would not have reasonably protected against, (any such event, a "Force Majeure Event") such Nonperforming Party shall, on condition that it complies with its obligations under this Section 9.4 (Force Majeure), be excused from its inability to perform its obligations hereunder, but only to the extent and for the duration of the Force Majeure Event adversely affecting the Nonperforming Party. The Nonperforming Party shall give the other party prompt written notice of the occurrence of a Force Majeure Event, including reasonable details which shall include but not be limited to the Force Majeure Event's effect on Nonperforming Party's performance and how long the Nonperforming Party expects the Force Majeure Event to last.  Thereafter such initial notice, Nonperforming Party shall update that information on a reasonable basis including at to material changes in the Nonperforming Party's circumstances regarding the Force Majeure Event impacting the Nonperforming Party ability to perform under this Agreement. The Nonperforming Party shall use reasonable efforts to mitigate the effect of the Force Majeure Event upon its performance of its obligations under this Agreement.   Provided that the other party has not terminated this Agreement per this Section 9.4 (Force Majeure), the Nonperforming Party shall resume performance hereunder as soon as reasonably practicable following the date of the Force Majeure Event.  In the event that Licensor is unable to perform due to a Force Majeure Event for longer than ten (10) days, SDSA shall have the right to terminate this Agreement for its convenience.

9.5     Independent Contractors.  For purposes of this Agreement, the relationship between Licensor and SDSA is that of vendor/customer (i.e. independent contractors) and Licensor agrees to do all things legally required to establish and maintain Licensor's status as an independent contractor.  This Agreement is not an authorization for Licensor to act for SDSA as its agent or to make commitments for or on behalf of SDSA, or vice versa.

9.6     Notices.  If one party is required or desires to give notice to the other, such notice shall be deemed given if mailed by U.S. mail, certified, postage prepaid, return receipt requested or via a United States nationally recognized overnight carrier, with all freight charges prepaid, and addressed as follows (or as subsequently noticed to the other party):

SDSA:                          Samsung SDS America, Inc.
                               100 Challenger Rd.
                               6th Floor
                               Ridgefield Park, NJ 07660
                               Attn: Legal Department
                               Phone: 201-393-3417


Licensor:                      WinMagic Inc.
                               5600A Cancross Court
                               Mississauga, Ontario, Canada L5R 3E9
                               Tel.: +1 905 502-7000

                               Page 9 of 18



Fax: +1 905 502-7001
Sales: 1-888-879-5879
E-mail: Info@WinMagic.com

9.7   Governing Law; Interpretation.  This Agreement shall be governed by and construed in accordance with the substantive laws (but not the rules governing conflicts of laws) of the State of New Jersey, United States of America. Any controversy arising hereunder or in relation to this Agreement shall be settled in New Jersey as hereinafter provided and set forth.   The courts and authorities in the State of New Jersey shall have jurisdiction over all controversies that may arise under or in relation to this Agreement, especially with respect to the execution, interpretation and compliance with the terms of this Agreement, the parties hereto waiving any other venue to which they might be entitled by virtue of domicile, habitual residence or otherwise. The parties hereby agree to waive their respective right to trial by jury.   The section and sub-section headings used herein are for reference and convenience only, and shall not enter into the interpretation hereof.

9.8   Bankruptcy of Licensor.  Failure of SDSA to assert its rights to retain its benefits in the intellectual property encompassed by the software pursuant to the United States Bankruptcy Code, 11 U.S.C. Sec. 365(n)(1)(B), under an executory contract rejected by the trustee in bankruptcy, shall not be construed by the courts as a termination of the contract by SDSA under Sec. 365(n)(1)(A) of the United States Bankruptcy Code.

9.9   Entire Agreement.  This Agreement, together with any Exhibits attached hereto and incorporated by reference herein, constitutes the entire agreement between SDSA and Licensor, and supersedes all prior communications, representations or agreements, whether oral or written, with respect to the subject matter hereof and has been induced by no representations, statements, or agreements other than those herein expressed.   No agreement hereafter made between the parties shall be binding on either party unless reduced to writing and signed by an authorized officer of the party sought to be bound thereby.   A waiver or amendment of any provision of this Agreement may only be made in writing signed by the authorized representatives of both parties.

9.10   Survival.  Sections 2 (License Grant; Fees and Payment); 3 (Delivery; Installation and Acceptance); 5 (Ownership and Confidentiality), 6 (Representation and Warranties; Indemnification; Limitation of Liability), 8 (Insurance), and 9 (General Provisions) of this Agreement, along with any other clauses which by their nature are intended to survive termination of the Agreement, shall survive the termination of this Agreement.

9.11   Export Restrictions.  The Software may be subject to export and import restrictions. Export of the Software outside of Canada and the United States may require prior approval of the appropriate government authorities. You agree to fully comply with all applicable laws and regulations applicable to the export and import of the Software.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by its duly authorized representatives below.


**Samsung SDS America, Inc.**                          **WinMagic Inc.**


By:_____                          By: _*(signature)*_____

Printed Name:_____                          Printed Name: _MICHAEL INGLIS_

Title:_____                          Title: _VP FINANCE_____

Date:_____                          Date: _April 29, 2016_____

SDSA Legal
Department
Approved as to
legal form (LO)
**SAMSUNG SDS**   2016.04.28
**AMERICA**   18:18:49 -04'00'

Confidential

**Exhibit A-1**

**Software Schedule A-1**

This Software Schedule Exhibit A-1 is effective as of the Effective Date and is made by and between SDSA and Licensor and forms a part of that certain Software License Agreement (Inbound) between the parties who have signed this Exhibit A-1 set forth below and to which it is attached ("Agreement"), and is subject to the terms, conditions, and limitations, of the Agreement. Defined terms used but not defined in this Software Schedule Exhibit A-1 shall have the meanings set forth in the Agreement.

1. **Software**: SecureDoc Enterprise Client TJ

2. **Software License Fees**: US$189,000.00

3. **Quantity of Copies of Software** (specify applicable units, e.g., copies, users, servers, etc.): 7,000

4. **License Term Commencement Date**: April 30, 2016 (if none then the Agreement Effective Date)

5. **License Term**: _____ years

6. **Maintenance and Support Fee.**  Licensor shall provide the maintenance and support services in respect to the Software as set forth on Exhibit B (Maintenance and Support Services) for a fee of US$75,600.00 (if left blank, then at no extra charge or fee) for a period of 3 years (if left blank, then for the duration of the License Term).

7. **SDSA Customer For Which SDSA Is Permitted to Utilize the Software On Behalf Of** (if left blank, then the Samsung group entities): Samsung Electronics America, Inc. ("SEA")

8. **Acceptance Criteria** (if left blank, then Acceptance shall be deemed to occur on receipt of the Deliverables): Acceptance of the Deliverables shall be determined in accordance with Section 3 of the Agreement.

9. **Additional Software Specifications** (if left blank, then none): None

10. **Hardware And Other Installation Requirements** (if left blank, then none):
      a. Five (5) days of Onsite Installation and Consulting at US$12,500.00
      b. Five (5) days of Web-Based Training at US$0

11. Open Source Software:

| Open Source Software | Applicable Open Source License |
|---|---|
| AE Scrypt 0.7 | BSD 3-clause |
| FreeBSD 1.1.1.1 | Free BSD |
| Gladman AES 2006-2008 | BSD 3-clause |
| Gladman SHA2 2005 release | BSD 3-clause |
| gnu-efi 3.0k | BSD 2-clause |
| OpenSSL 0.9.8g | OpenSSL Combined License |
| rEFIt 0.14 | BSD 3-clause |
| TPM Monitor – TrouSerS 0.2.8 | Common Public License Version 1.0 |
| trousers - tpm-tools 1.1b | Common Public License Version 1.0 |
| Zlib 1.2.3 | zlib/libpng License |
| linux-4.2.6.tar.xz | GPL-2.0 |
| ./sources/linux-4.2.6.wm.sd_header.patch | GPL-2.0 |
| ./sources/linux-4.2.6.wm.alps_touchpad_fix.patch | GPL-2.0 |
| ./sources/linux-4.2.6.wm.saving_usb_state.patch | GPL-2.0 |
| ./sources/linux-4.2.6.wm.video_mode.patch | GPL-2.0 |
| ./sources/linux- | GPL-2.0 |

Confidential

| | |
|---|---|
| 4.2.6.wm.amd_ahci_reprog.patch | |
| bash-3.2.tar.gz | GPL-2.0 |
| bcmwl-6.30.223.248+bdcom.tar.gz | GPL-2.0 |
| e1000e-3.2.4.2.tar.gz | GPL-2.0 |
| pmLinux-WebDT312-serial-V20120111.tar.bz2 | GPL-2.0 |
| rtlwifi_new-master.tar.gz | GPL-2.0 |
| wpa-service-0.24.1.tar.bz2 | GPL-2.0 |
| bzip2-1.0.4.tar.gz | Available for review |
| coreutils-6.9.tar.bz2 | GPL-2.0 |
| dhcpcd-5.2.9.tar.bz2 | BSD 2-clause |
| dmidecode-2.10.tar.gz | GPL-2.0 |
| fbset_2.1.orig.tar.gz | GPL-2.0 |
| findutils-4.2.31.tar.gz | GPL-2.0 |
| glibc-2.5.1.tar.bz2 | LGPL v2.1 |
| glibc-libidn-2.5.1.tar.gz | LGPL v2.1 |
| grep-2.5.1a.tar.bz2 | GPL-2.0 |
| gzip-1.3.12.tar.gz | GPL-2.0 |
| hdparm-9.26.tar.tar | BSD 2-clause |
| heci-5.0.0.30.tart.gz | BSD 3-clause |
| iana-etc-2.20.tar.bz2 | OSL-3.0 |
| inetutils-1.5.tar.gz | GPL-3.0 |
| inputattach.tar.gz | GPL-2.0 |
| iproute2-2.6.20-070313.tar.gz | GPL-2.0 |
| kbd-1.12.tar.bz2 | GPL-2.0 |
| less-406.tar.gz | GPL-2.0 |
| dbus-1.0.2-10.3mdv2008.0.src.rpm | GPL-2.0 |
| ccid-1.4.0.tar.bz2 | LGPL-2.1 |
| hal_0.5.14.orig.tar.gz | CPL-1.0 |
| libusb-1.0.8.tar.bz2 | LGPL-2.1 |
| lshw-B.02.14.tar.gz | GPL-2.0 |
| Mdadm | GPL-2.0 |
| ncurses-5.6.tar.gz | BSL-1.0 |
| opensc-0.11.13.tar.gz | LGPL-2.1 |
| openssh-5.3p1.tar.gz | BSD 2-clause |
| openssl-0.9.8w.tar.gz | Combined OpenSSL |
| openssl-0.9.8k.tar.tar | Combined OpenSSL |
| pcsc-lite-1.6.4.tar.bz2 | BSD 3-clause |
| procps-3.2.7.tar.gz | GPL-2.0 |
| psmisc-22.5.tar.gz | GPL-2.0 |
| qt-everywhere-opensource-src-4.6.0.tar.gz | Qt GNU LGPL v2.1 |
| readline-5.2.tar.gz | GPL-2.0 |
| sed-4.1.5.tar.gz | GPL-2.0 |
| sysklogd-1.4.1.tar.gz | GPL-2.0 |
| sysvinit-2.86.tar.gz | GPL-2.0 |
| tar-1.18.tar.bz2 | GPL-3.0 |
| tslib-master.tar.gz | GPL-2.0 |
| tslib-close.patch | GPL-2.0 |
| tslib-wm.patch | GPL-2.0 |
| util-linux-2.12r.tar.bz2 | GPL-2.0 |
| vim-7.1.tar.bz2 | GPL-2.0 |
| wpa_supplicant-1.0.tar.gz | BSD 2-clause |
| zlib-1.2.3.tar.gz | Available for review |

WinMagic SDSA Software License Agreement (Inbound)
v20160119 1118

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Exhibit A-1 to be executed by the duly authorized representatives below.

**Samsung SDS America, Inc.**

By:_____

Printed Name:_____

Title:_____

Date:_____

**WinMagic, Inc.**

By: _~~illegible signature~~_____

Printed Name: MICHAEL INGLIS

Title: VP FINANCE

Date: April 29, 2016

SDSA Legal
Department
Approved as to
legal form (LO)
2016.04.28
18:19:17 -04'00'

SAMSUNG SDS
AMERICA

**Exhibit B**
**Maintenance and Support Services**

## SUPPORT SERVICE LEVEL AGREEMENT (SSLA) – <u>STANDARD LEVEL</u>

The purpose of this Support Service Level Agreement is to specify the services and commitments with respect to technical support to be provided by WinMagic in accordance with the Software License Agreement ("Agreement"), effective April 25, 2016, between Samsung SDS America, Inc. ("SDSA" or "Customer") and WinMagic, Inc. ("Licensor" or "WinMagic").

**DEFINITIONS:**

"Product" means the Software and Documentation (as both are defined in the Agreement) furnished to SDSA by Licensor.

"Major Release" means the first Version of a product that has an immediately subsequent ordered digit to the left of the decimal point compared to the immediately prior release.

"Minor Release" means all Versions after a Major Release that share the same digit to the left of the decimal point. This will usually, but not always include bug fixes or patches for updates to supported operating systems.

"Regular Business Hours" are defined as 8:00 AM to 5:00 PM Eastern Standard or Daylight Time from Monday to Friday, with the exception of specified statutory holidays.

"Renewal" means a term of the SSLA immediately after the initial term or any subsequent term of the Agreement.

"SSLA" means this Support Service Level Agreement.

"SES" means the management console and deployment mechanism of the enterprise version of the Product.

"Territory" means the physical location where delivery of the Product occurs.

"Version" means the discrete release of the Product identified by the X.X number.

"Workaround" means a change in the followed procedures or data to avoid error without substantially impairing use of the Product.

SDSA has purchased support services from Licensor and the parties hereby agree as follows:

**1.     TERM**
The term of this SSLA is as set forth in Section 7 of the Agreement.

**2.     ACCEPTANCE OF SSLA**
By approving the initial quote for support services or subsequent notice of renewal and providing such to Licensor, or providing Licensor with an approved purchase order, SDSA acknowledges and agrees that SDSA has had the opportunity to read and understand this SSLA, and SDSA confirms to be bound by the terms and conditions of this SSLA.

**3.     SUPPORT SERVICES**
3.1     Services
Licensor shall provide SDSA with the following support services while this SSLA is in force and all associated fees are paid in full and SDSA's support term has not expired:

Confidential

| Support Service Matrix | Standard Support |
|---|---|
| Access to Telephone Support 8:00 AM to 7:00 PM Eastern Standard or Daylight Time from Monday to Friday, with the exception of specified statutory holidays | Yes |
| Support Service levels - Standard (see definition in section 3.2) | Yes |
| E-mail support | Yes |
| Online (electronic Ticketing) | Yes |
| Online Knowledge Base | Yes |
| Documentation (manuals, release notes, set-up guides) | Yes |

3.2    Support Service Levels - Standard

| Severity Level | Definition | Response Requirement | Implementation |
|---|---|---|---|
| 1 | Catastrophic problem that may severely impact the customer's ability to conduct business. This may mean that the customer's systems and/or Program are down or not functioning and no procedural workaround exists | WinMagic responds directly to the Customer within four (4) hours following receipt of the call from Customer.  Customer and WinMagic will develop an Action Plan within four (4) hours following receipt of the call. | The objective is to get the customer back on line by whatever means within forty-eight (48) hours and to downgrade the problem severity accordingly. Efforts to isolate, diagnose, and deliver a workaround or repair to a Severity 1 problem shall be continuous during business hours (Monday through Friday, 8 am – 5 pm) Daily phone contact and progress updates are also expected. These progress updates should be according to the Action Plan or not less than once per day until the problem severity is reduced.  When the severity level has been changed to Severity 2 or Severity 3 (defined below) the appropriate guidelines should be followed.  Resources must be available on a business day basis (8 am to 5 pm) to respond to Severity 1 cases. |
| 2 | High-impact problem in which the customer's operation is disrupted but there is capacity to remain productive and maintain necessary business-leveled operations. | WinMagic's engineering support organization will respond to the Customer within eight (8) hours following receipt of the call from the Customer during normal business hours or otherwise on the next business day | The objective is to have a solution and/or fix to the customer within an average of twenty (20) days. Efforts to isolate, diagnose, and deliver a workaround or repair shall be continuous during business hours (Monday through Friday, 8 am – 5 pm).  Specific implementation should be agreed between Customer and WinMagic on a case-by-case basis and documented in an Action Plan within five (5) business days of receipt of the call by WinMagic.  The frequency that WinMagic shall provide status updates shall be once per week or as agreed in the Action Plan.  Resources may need to be available after hours and/or weekends depending on the Action Plan. |
| 3 | Medium-to-low impact problem involving partial loss of non-critical functionality.  The problem impairs some operations (including Documentation errors) but allows the customer to continue to function. | WinMagic's support organization will respond to the Customer within three (3) business days | The objective is to have a solution and/or resolution plan to the customer within an average of thirty (30) days. Efforts to isolate, diagnose, and deliver a workaround or repair shall be continuous during business hours (Monday through Friday, 8 am – 5 pm). |
| 4 | General usage questions, recommendations for future product enhancements or modifications. There is no impact on the quality, performance or functionality of the Program. | WinMagic's support organization will respond in a manner appropriate to the nature of the escalated call. | WinMagic will respond to the submission and, if appropriate, will provide a reviewed and edited copy of the submission and a recommendation for its disposition. |

Notes:
1)    Licensor does not guarantee the resolution of a problem within the times specified.  The response times set forth in this section constitute targeted goals of Licensor, and the parties understand that Licensor shall use commercially reasonable efforts to meet these responses times.  The parties acknowledge the potentially idiosyncratic nature of any issue, and agree that any sporadic failure to meet these response times shall not constitute a breach of Licensor's support obligations under this SSLA.   Notwithstanding the terms of the Agreement, and in addition to the above section, **for the first three (3) years from the date of first delivery of the Product,** Licensor and SDSA agree to the following:

Confidential

a. for Severity Level 1 problems where the parties, acting reasonably, jointly agree the problems are caused by the Product, Licensor will correct the problem to the reasonable satisfaction of SDSA within 10 days of the date of agreement between the parties that the problem was caused by the Product.  If the problem is not corrected within 10 days, but is corrected within 30 days, SDSA shall be entitled to an immediate refund of 50% of one year's support fees.  If the problem is corrected after 30 days but within 45 days, SDSA shall be entitled to an immediate refund of 75% of one year's support fees.  If the problem is corrected after 45 days, SDSA shall be entitled to an immediate refund of 100% of one year's support fees.

b. for Severity Level 2 problems where the parties, acting reasonably, jointly agree the problems are caused by the Product, Licensor will correct the problem to the reasonable satisfaction of SDSA within 20 days of the date of agreement between the parties that the problem was caused by the Product.  If the problem is not corrected within 20 days, but is corrected within 45 days, SDSA shall be entitled to an immediate refund of 25% of one year's support fees.  If the problem is corrected after 45 days, SDSA shall be entitled to an immediate refund of 50% of one year's support fees.

c. SDSA agrees to accept a service pack release as an acceptable correction if such service pack release is available to SDSA and the service pack release, if installed in SDSA's environment, corrects the problem to the reasonable satisfaction of SDSA.  The date of general release of a service pack release will determine the date of correction for purposes of this section.

2) Licensor and SDSA will jointly determine, acting reasonably, the appropriate severity level for a given issue.

## 3.3    Escalation Process

If SDSA feels that a severity level 1 or 2 issue is not moving forward towards resolution at an appropriate timeframe, or feels an issue requires management attention, SDSA may request their technical representative to connect SDSA to the team lead of the technical representative handling their case.  Further escalations may be requested by SDSA to the Vice President, Operations followed by escalation to the President/CEO of Licensor.

## 3.4    Obligation to Provide Services

Licensor shall have no obligation to provide support services as defined under this SSLA where:
a) The Product Version used by the SDSA is past its End of Life date;
b) The Product or support services are not purchased from Licensor or an authorized partner;
c) An issue is caused by:
   i. Relocation, movement, improper operation, neglect, misuse or misapplication of the Product, including use on unsupported operating systems;
   ii. SDSA's failure to maintain proper site or environmental conditions;
   iii. Any fault of SDSA's agents or employees;
   iv. Any attempts at repairs, maintenance, or modifications to the Product performed by other than authorized service personnel of Licensor,
   v. Casualty, act of God, strikes, riot, war, the unauthorized acts of third parties,
   vi. Failure or interruption of any electrical power, telephone or communication line or like cause, or
   vii. Any other cause external to the Product except ordinary use.

## 3.5    Excluded Services

Support services do not include the following:
a) Step-by-step installation of Product (except as provided on the online knowledge base);
b) On-site professional services or training (unless provided as part of the support package purchased);
c) Modification of software code (see section 3.6), security policy configuration and/or design.

## 3.6    Bug Fixes and other Patches

Licensor does not apply bug fixes to the most recent released Version.  Bug fixes and any other patches (required as necessary for changes to operating systems) will be included in the next available Version (or Minor Release) and SDSA agrees to use that next available Version to apply the bug fixes or patches. Licensor reserves the right to provide bug fixes patches directly to SDSA to apply to the Version used by SDSA, if so decided by Licensor at its sole discretion.

Confidential

3.7     Online Knowledge Base
Licensor's Online Knowledge base provides SDSA with access to a repository of technical documents, release notes, known limitation documents, product advisories, and troubleshooting guides.

3.8     Onsite Support
If SDSA's purchased support service includes onsite support services, a Licensor technical representative will visit SDSA's site subject to the following conditions:

    a)  Onsite visits will be undertaken only if all other support service activities have failed to resolve the issue;
    b)  SDSA is limited to three (3) discrete site visits per year;
    c)  For any additional days onsite that is required after the first three (3) days, SDSA will be charged at Licensor's then-current list price for professional services;
    d)  SDSA agrees to reimburse Licensor for reasonable travel costs for onsite visits;
    e)  If, after the visit, it is determined by Licensor that the source of the issue is other than the Product or SDSA has not installed available bug fixes, SDSA agrees that it will pay Licensor for the on-site services at Licensor's then-current list price for professional services;
    f)  SDSA agrees to provide Licensor or its authorized partner with sufficient and safe access to SDSA's facilities in order to permit Licensor to fulfill its obligations under the SSLA;
    g)  SDSA understands that onsite support may not be available or may be delayed for some geographic regions.

3.9     SDSA Obligations
SDSA agrees to ensure that:

    a)  It maintains current back-up copies of relevant files, data and configurations necessary for Licensor to provide support services;
    b)  It is able to adequately describe the issue and provide required information to allow Licensor to provide support services;
    c)  SDSA personnel are appropriately trained on the Version of the Product for which SDSA requires assistance so that SDSA is able to undertake specific tasks as directed by Licensor to assist in troubleshooting; and
    d)  It is prepared to provide Licensor with timely access to SDSA's network for severity 1 or 2 issues.

3.10    Support Lifecycle
Licensor provides support services as defined in Section 3.1 on (i) all Versions of the then current Major Release and (ii) all Versions of the immediately preceding Major Release that were released in the preceding three (3) years.  Licensor reserves the right to change support lifecycle policy subject to 6 months advance notice to SDSA.

3.11    End of Life (EOL) Process
A Version is considered EOL when it has been superseded by a Major Release and three (3) years has passed since the date a Version was released.  Licensor will provide at least 12 months notification of EOL of a Version; such notification method to be determined solely by Licensor. Licensor reserves the right to accelerate the EOL of a Version as a result of non-conformance to published specifications of a Version.  If EOL is accelerated, Licensor shall provide a fix for the reported non-conformance that may be available at the time the non-conformance is reported.  If no such fix is available, Licensor will use commercially reasonable efforts to remedy such non-conformance, which may include a Workaround or other temporary fix.

3.12    Computing Platforms (Operating Systems)
Computing platforms supported by a Product Version are specified by Licensor in the Product Version information Documentation and/or Release Notes. Licensor reserves the right to discontinue the support of any Product Version and Computing Platform combination at its discretion, with the same notice to SDSA as provided for the EOL Process.

**4.     APPROVED CONTACTS** (applicable to customers with an enterprise setting with deployment through SES)
This SSLA requires that SDSA specify a limited number of individuals (usually 2 to 4 depending on number of Licenses) authorized to contact Licensor for support services.  Typically, this would be the SDSA's SES Administrator and/or Help/Support Desk Staff within SDSA's IT department.

**5.     SSLA FEES**
5.1     Initial Term and Fees
SDSA shall pay Licensor for the maintenance and support services as set forth in Exhibit A-1.

5.2     Subsequent Terms (Renewals) and Fees
For each successive term of this SSLA, SDSA shall pay an SSLA Renewal fee in accordance with the signed notice of renewal or authorized SDSA purchase order, for ALL the licenses of the Product purchased by SDSA.  Renewal of SSLA must apply to ALL licenses purchased by SDSA.

5.3     Payments
All fees payable under this SSLA shall be paid in accordance with Section 2.4 of the Agreement.

5.4     Lapse in Support Services
SDSA shall incur reinstatement charges in the event of a partial or full lapse and subsequent renewal. Reinstatement charges will consist of retroactive fees for lapsed periods equal to most recent paid term of support prorated to cover the lapsed period, plus a reasonable administrative fee set by Licensor.  SDSA will not be entitled to reinstate support services at this fee structure if the lapse has been three (3) years or longer; in such situations, SDSA shall be required to pay a fee at least equal to the original purchase price of the Product (for the original quantity of licenses) plus at least one year of support.

5.5     Fee Increases
Licensor may increase its support fees at the beginning of any renewal term of the SSLA for the Products.  Any such price increase shall be subject to written notice of at least 60 days prior to the effective date of the price increase.

5.6     Taxes, Hardware Fees
Support fees shall not include excise, sales, use, duty, or other taxes, nor the costs of any hardware delivered as part of the Product.  SDSA shall pay Licensor in advance the amount of any such tax or additional fee (other than withholding taxes).  SDSA shall not be responsible for taxes of any kind relating to Licensor income relating to this SSLA.

**6.     RENEWAL AND TERMINATION OF SSLA**
6.1     Convenience
For convenience, and unless instructed by SDSA otherwise, Licensor shall send SDSA a renewal quote or invoice a minimum of thirty (30) days before the end of the term of this SSLA. SDSA has the option to decline this renewal in writing and cancel the renewal invoice, but only for all licenses purchased and covered under this SSLA.  SDSA's right of termination under this Section 6.1 is in addition to and not in lieu of any right to terminate by SDSA under Section 7 of the Agreement.

6.2     Refund of Support Fees
In the event of termination under Section 7.3 of the Agreement due to breach by Licensor, then Licensor shall promptly refund to SDSA on a pro-rata basis all SSLA fees and deemed SSLA fees prepaid or deemed prepaid to Licensor. Any termination by SDSA without cause under Section 7.2 of the Agreement during the current term will result in the forfeiture of any prepaid SSLA fees paid by SDSA.

**7. General**
7.1     In the case of a conflict between the terms and conditions of this SSLA and the terms and conditions of the Agreement, the terms and conditions of the Agreement will take precedence.

Confidential